**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

JONATHAN D. STRUM et al.,

       *Plaintiffs*,

   v.

IBRAHIM MARDAM-BEY et al.,

       *Defendants*.

Civil Action No. 24-401 (TJK)

## <u>MEMORANDUM OPINION</u>

When Jonathan Strum sent $50,000 to Ibrahim Mardam-Bey, he allegedly thought he was investing in a cryptocurrency fund. Mardam-Bey and his LLC, Merchant Edge, had marketed that investment opportunity to Strum and others. Eventually, Mardam-Bey proposed a transaction structure that would help Strum avoid some problems he had encountered when first trying to invest. Mardam-Bey and Merchant Edge would set up an entity that could receive Strum's money and then invest it into the cryptocurrency fund for Strum. In 2022, Mardam-Bey told Strum that this investment plan had been approved, and Strum transferred $50,000 to Mardam-Bey's personal account.

Strum says that money never reached the cryptocurrency fund. Instead, he alleges that Mardam-Bey and Merchant Edge used it as they pleased for personal and business expenses before returning $30,000. Seeking relief in D.C. Superior Court, Strum sued those two and several other entities in early 2024. The defendants removed the case, and Strum amended his complaint to bring six state-law claims against only Mardam-Bey and Merchant Edge. Moving to dismiss, those remaining defendants argue that the amended complaint falters on jurisdictional grounds and on the merits. But the Court has subject-matter jurisdiction over this case, and most—though not

all—of Strum's claims are plausible. So the Court will grant in part and deny in part the motion to dismiss.

## I.    Background

According to the amended complaint, in mid-2020, Ibrahim Mardam-Bey and Merchant Edge LLC—a "capital advisory firm" over which Mardam-Bey, as the chief executive officer, "exercises total dominion and control"—began promoting "Alphemy US Fund I LP" ("AUSF"), which would "feed[]" into a cryptocurrency investment fund called "Alphemy Master Fund." ECF No. 19 ("Am. Compl.") ¶¶ 3, 6, 8, 10, 21. Those promotional efforts reached Jonathan Strum.[1] Specifically, Mardam-Bey allegedly gave Strum "webinars" about investing in AUSF, solicited funds from him, and sent AUSF documents to him. *Id.* ¶ 16.

Strum and Mardam-Bey have a history that predates the AUSF pitch. According to Strum, Mardam-Bey owed him over $500,000 "in promissory notes" that Mardam-Bey and his wife never paid, which led to a previous lawsuit in D.C. Superior Court. Am. Compl. ¶ 23. This alleged debt prompted the proposed AUSF investment; if Strum held units in that fund, Mardam-Bey "would transfer [u]nits in [AUSF] in settlement of" Strum's claims at the end of the fund's term. *Id.* ¶ 24. Although Strum tried to invest by sending $50,000 to "MS Stover," that entity (or individual; Strum does not say) returned the money because of an "SEC action against Strum in 2018." *Id.* ¶ 26. Mardam-Bey then offered another idea: he "and/or Merchant Edge" could "set up a limited liability corporation or limited [p]artnership to invest in AUSF." *Id.* ¶ 27. Later, Mardam-Bey told Strum that "MS Stover and Alphemy Capital" had approved an investment structure along those lines that would utilize "LP1," an entity established by Mardam-Bey and Merchant Edge

---

[1] Strum sues individually and as trustee of the JDS SEP 2021 Trust, "a simplified employee pension" that he established "as a self-directed IRA." Am. Compl. ¶ 2. For readability, and because nothing turns on the distinction, the Court refers only to "Strum."

that would receive smaller investments and then invest those funds in AUSF. *Id.* ¶ 29. In May 2022, Mardam-Bey "frequently told" Strum "that the time was right for an investment in crypto" and that he should do so through LP1. *Id.* ¶ 30.

Strum did just that—or so he thought. On May 27, 2022, Strum "caused the JDS Trust to transfer $50,000" to Mardam-Bey's "personal account . . . for the purpose of investing in AUSF through" LP1. Am. Compl. ¶ 31. But, according to Strum, LP1 did not exist. *Id.* ¶ 33. Instead, Mardam-Bey and Merchant Edge allegedly "converted" Strum's $50,000 "for their own purposes" without ever trying to invest in AUSF. *Id.* ¶¶ 33–34. Those purposes, Strum says, included supporting Mardam-Bey's "international lifestyle"—for example, attending the 2022 World Cup in Qatar—and "Merchant Edge's ongoing operations." *Id.* ¶ 33.

Strum suspected something was off when Mardam-Bey and Merchant Edge refused his requests for "documents and updates" on the status of the AUSF investment. Am. Compl. ¶ 32. So he has "sought return" of the funds "since the summer of 2022." *Id.* ¶ 36. Sometime over the next several months, Mardam-Bey returned $15,000 through a Merchant Edge account. *Id.* ¶¶ 37, 42. But Strum suffered a stroke in February 2023, which he attributes to the "failure to return" his funds—a failure that caused him "tremendous mental anguish" and "emotional distress." *Id.* ¶ 37. Despite knowing about these struggles, Mardam-Bey and Merchant Edge purportedly returned only another $15,000 after the stroke. *Id.* ¶¶ 44, 53.

In early 2024, Strum sued several parties in D.C. Superior Court: Mardam-Bey, Merchant Edge, Alphemy Capital, AUSF, and Alphemy General Partners. *See* ECF No. 1-1 at 3–4. Citing diversity jurisdiction under 28 U.S.C. § 1332, the three Alphemy defendants—with the consent of Mardam-Bey and Merchant Edge—removed the case to federal court. *See* ECF No. 1 at 1, 3, 8. Strum and the JDS trust, they explained, were citizens of Washington, D.C. *Id.* at 4. And every

defendant was a citizen of a different state (or was a citizen of a foreign country). *Id.* at 4–7. As relevant here, the removal notice explained that Mardam-Bey was a citizen of Maryland or Lebanon and that Merchant Edge—as an LLC whose only members are Mardam-Bey and his wife—was a citizen of Maryland, Lebanon, "and/or" Tanzania (where Mardam-Bey's wife is "currently on assignment"). *Id.* at 4–5. Nor was there a problem with the amount-in-controversy requirement; Strum easily cleared $75,000 because he sought $50,000 in compensatory damages, $1,000,000 in special damages, and $10,000,000 in punitive damages. *Id.* at 8.

Strum dismissed the case against the Alphemy defendants in March 2024, leaving only Mardam-Bey and Merchant Edge ("Defendants"). *See* ECF No. 18. He then filed an amended complaint bringing six state-law claims against those two: breach of contract (Count I); unjust enrichment (Count II); fraud (Count III); conspiracy to commit fraud (Count IV); intentional infliction of emotional distress (Count V); and conversion (Count VI). *See* Am. Compl. ¶¶ 49–79. Defendants move to dismiss every claim—at least in part, as explained below.

## II.    Legal Standards

A plaintiff must establish the Court's subject-matter jurisdiction to survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(1). *Arpaio v. Obama*, 797 F.3d 11, 19 (D.C. Cir. 2015). The Court "assume[s] the truth of all material factual allegations in the complaint and 'construe[s] the complaint liberally, granting plaintiff the benefit of all inferences that can be derived from the facts alleged,' . . . and upon such facts determine[s] jurisdictional questions." *Am. Nat'l Ins. Co. v. FDIC*, 642 F.3d 1137, 1139 (D.C. Cir. 2011) (quoting *Thomas v. Principi*, 394 F.3d 970, 972 (D.C. Cir. 2005)). Further, the Court "may consider documents outside the pleadings to assure itself that it has jurisdiction" without "convert[ing]" a motion to dismiss "into one for summary judgment." *Ballard v. Kendall*, 640 F. Supp. 3d 41, 48 (D.D.C. 2022). Without subject-matter jurisdiction over a claim, the Court must dismiss it. *Arbaugh v. Y&H Corp.*, 546

U.S. 500, 506 (2006).

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a complaint must "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A plaintiff states a facially plausible claim when he pleads "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The Court accepts as true "all well-pleaded factual allegations" and "construes reasonable inferences from those allegations in the plaintiff's favor." *Sissel v. HHS*, 760 F.3d 1, 4 (D.C. Cir. 2014). But "mere conclusory statements" are not enough to establish a plausible claim, and courts "are not bound to accept as true a legal conclusion couched as a factual allegation." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555).

## III.   Analysis

Defendants move to dismiss every claim on jurisdictional grounds and most for failure to state a claim. Their jurisdictional argument, however, relies on their assessment of the strength of Strum's claims, which is irrelevant for jurisdictional purposes. As for the merits, Defendants take an overly cramped view of the allegations about Merchant Edge's conduct. Instead, those allegations—taken as true—plausibly state claims against Merchant Edge for breach of contract, unjust enrichment, and conversion. So too for Mardam-Bey, who does not argue that Strum fails to plausibly allege these claims against him but rather contends (prematurely) that the damages sought are too high. The fraud claim also survives—against Mardam-Bey on a direct theory of liability and against Merchant Edge on a conspiracy theory—but the fraudulent-conspiracy claim, to the extent Strum alleges it as an independent cause of action, does not. In addition, the claim for intentional infliction of emotional distress falters against both defendants because the alleged conduct does not clear the high bar for that tort.

5

Before explaining these conclusions, the Court pauses to address two preliminary points relevant to every claim. First, although the parties do not address choice of law, District of Columbia law applies. Sitting in diversity jurisdiction, the Court must apply the District's choice-of-law rules. *In re APA Assessment Fee Litig.*, 766 F.3d 39, 51 (D.C. Cir. 2014). Those rules, in turn, call for "a modified governmental interests analysis which seeks to identify the jurisdiction with the most significant relationship to the dispute." *Id.* (citation omitted). And factors relevant to that inquiry include the location of both the injury and the conduct that caused it, as well as the characteristics of the parties—their "domicile, residence, nationality, place of incorporation and . . . business, and the place where the relationship is centered." *Wu v. Stomber*, 750 F.3d 944, 949 (D.C. Cir. 2014) (internal quotation marks and citation omitted). Applied here, those factors point to District of Columbia law. Strum alleges that Defendants "solicited funds for AUSF from [him] in Washington DC" and that he transferred the funds while there. Am. Compl. ¶¶ 9, 16, 31. Further, Strum lives in D.C., and his relationship with Defendants seems centered there too. *Id.* ¶¶ 1, 16. Defendants' non-D.C. citizenship does not outweigh these other considerations showing that the District has the most significant relationship to this dispute.

Second, Strum alleges that "Merchant Edge is the alter[] ego of Ibrahim Mardam-Bey," Am. Compl. ¶ 8, and argues this point in his opposition, *see* ECF No. 22 at 9–12. But he never explains what that means for the viability of his claims at the pleading stage. And the Court does not see how an alter-ego theory makes a difference for any of them. That doctrine permits courts "to cast aside the corporate shield and fasten liability on the individual shareholder" if "substantial ownership of stock is concentrated in one person or a few persons and other factors support disregarding the corporate entity." *Estate of Raleigh v. Mitchell¸* 947 A.2d 464, 470 (D.C. 2008) (citation omitted). The alter-ego theory, though, is not a "discrete claim[]" but a way to try to "extend

liability" on the "underlying" claims beyond the "corporate entity to" the "individual" shareholders. *TAC-Critical Sys., Inc. v. Integrated Facility Sys., Inc.*, 808 F. Supp. 2d 60, 66 (D.D.C. 2011). Yet Strum has already sued Mardam-Bey as an individual. And no claim rests on Merchant Edge's conduct such that Strum needs to pierce the corporate veil to get to Mardam-Bey as a shareholder; as discussed below, every claim that survives against Merchant Edge also survives against Mardam-Bey as an individual. The Court thus need not decide whether Mardam-Bey could be liable under an alter-ego theory—at least not at this stage of the litigation, where no claim's viability turns on that determination and where there has been no factual development on this issue.

### A.    The Court Has Subject-Matter Jurisdiction

A federal "court must always assure itself of its subject-matter jurisdiction regardless of whether a party has raised a challenge." *Kaplan v. Cent. Bank of the Islamic Republic of Iran*, 896 F.3d 501, 511 (D.C. Cir. 2018). Defendants here do contest jurisdiction by arguing that the amount in controversy does not exceed $75,000. If so, this Court lacks diversity jurisdiction under 28 U.S.C. § 1332, which requires that more than that amount be at stake. And with no federal claim, this case would have no jurisdictional hook and would thus require "remand[]" to D.C. Superior Court. 28 U.S.C. § 1447(c). Strum's amended complaint—not the original—dictates the jurisdictional question. *See Royal Canin U.S.A., Inc. v. Wullschleger*, No. 23-677, 2025 WL 96212, at *5 (Jan. 15, 2025).

By its terms, that amended complaint seeks well over $75,000. Strum requests $50,000 in compensatory damages, somewhere between $1,000,000 and $5,000,000 in special damages (depending on the count), and $10,000,000 in punitive damages. *See* Am. Compl. at 8–12. How do Defendants whittle that down to $75,000 or less? First, they say that several claims—breach of contract, unjust enrichment, and conversion—are capped at $20,000 because Strum alleges that Defendants returned $30,000. *See* ECF No. 20 at 9. Second, Defendants assert that punitive

damages are "generally <u>not</u> available for a breach-of-contract claim." *Id.* at 10. And third, they contend that the other claims fail on the merits. *Id.* So all that remains is $20,000 in compensatory damages.

That is not how subject-matter jurisdiction works. Strum requests damages far beyond the jurisdictional minimum. To reject those "claimed damages, it must appear to a legal certainty that the claim is really for less than the jurisdictional amount." *Bronner v. Duggan*, 317 F. Supp. 3d 284, 288 (D.D.C. 2018) (cleaned up and citation omitted). A plaintiff may clear that low bar "even if" the Court "has serious doubts as to the bases for establishing the amount-in-controversy." *Id.* So whether Defendants "have a good defense against" Strum's claims "does not affect" the calculation. *Pierce v. Showell*, 357 F. Supp. 2d 307, 309–10 (D.D.C. 2005) (jurisdictional amount met where plaintiff sought $250,000 in compensatory damages based on defendant's failure to pay $42,000 in expected return on $7,000 promissory note). Put simply, the Court's task is "not to predict" Strum's "prospects on the merits" or "the amount that [he is] most likely to recover." *Schutte v. Ciox Health, LLC*, 28 F.4th 850, 855 (7th Cir. 2022). And it is not a "legal certainty that" Strum "either cannot recover the amount claimed or was never entitled to recover damages." *Compton v. Alpha Kappa Alpha Sorority, Inc.*, 64 F. Supp. 3d 1, 14 (D.D.C. 2014). For example, he might recover "punitive damages" for one of his "intentional tort[]" claims like fraud or intentional infliction of emotional distress. *Calvetti v. Antcliff*, 346 F. Supp. 2d 92, 108 (D.D.C. 2004). Because Defendants' view of the likelihood of that happening does not cap Strum's claimed damages at $75,000 with legal certainty, § 1332's amount-in-controversy requirement poses no jurisdictional hurdle.

The Court must pause, however, to consider another. For § 1332 to provide jurisdiction, the parties must be completely diverse. Each American plaintiff, in other words, must be a citizen

of a different state or country than each defendant. *See Lincoln Prop. Co. v. Roche*, 546 U.S. 81, 89 (2005); *see also* § 1332(a)(2). The amended complaint leaves something to be desired on this front. Strum lives in Washington, D.C., and he also sues as trustee of the JDS Trust. Am. Compl. ¶¶ 1–2. So both plaintiffs appear to be citizens of D.C.; when a "trustee files a lawsuit" in his "own name," his "citizenship is all that matters for diversity purposes." *Americold Realty Tr. v. Conagra Foods, Inc.*, 577 U.S. 378, 383 (2016); *see also Wang ex rel. Wong v. New Mighty U.S. Tr.*, 843 F.3d 487, 494 (D.C. Cir. 2016) (reading *Americold* to mean that "the citizenship of a traditional trust depends only on the trustees' citizenship"). As for Mardam-Bey, Strum alleges that he was "born in Lebanon" and lives in Maryland. Am. Compl. ¶¶ 3–4. And although Merchant Edge takes the citizenship of its members as an LLC, *see CostCommand, LLC v. PRS Software Sols., Inc.*, 73 F. Supp. 3d 111, 114 (D.D.C. 2014), the amended complaint is not clear on who those members are. Still, Strum suggests that Mardam-Bey (who "exercises total dominion and control" over Merchant Edge) and possibly his wife (whom Strum calls a "co-owner" without saying what the couple owns) are the LLC members. *See* Am. Compl. ¶¶ 4, 8.

Despite these ambiguities, the notice of removal clears up any jurisdictional concerns.[2] That notice explains that Mardam-Bey is a citizen of Maryland or Lebanon and that Merchant Edge—an LLC whose only members are Mardam-Bey and his wife—is a citizen of "Tanzania, Maryland, and/or Lebanon." ECF No. 1 at 4–5. Though less explicit, the amended complaint is

---

[2] The Court may consider the notice of removal when assessing jurisdiction. Indeed, "a district court errs in failing to consider a *pro se* litigant's complaint 'in light of' all filings." *Brown v. Whole Foods Mkt. Grp.*, 789 F.3d 146, 152 (D.C. Cir. 2015). And "[w]hen reviewing a challenge pursuant to Rule 12(b)(1), a court may consider documents outside the pleadings to assure itself that it has jurisdiction." *Andrade v. Gen. Servs. Admin.*, No. 23-cv-245 (TSC), 2024 WL 68240, at *2 (D.D.C. Jan. 5, 2024). Although Defendants' motion to dismiss on jurisdictional grounds does not target the geographical aspect of diversity jurisdiction, the Court sees no reason why it cannot—or why it should not—account for the notice of removal to which Defendants consented.

consistent with the notice's description of Defendants' citizenship.  This case, then, is one where the Court had jurisdiction at the time of removal and where no party has challenged *this* aspect of diversity jurisdiction (the citizenship of the parties) after Strum amended the complaint.  And while the Court must assure itself of its own jurisdiction, nothing in the amended complaint undermines that jurisdictional basis.  Because it does not "appear[] that the [Court] lacks subject matter jurisdiction," the Court will not "remand[]" the case.  28 U.S.C. § 1447(c).

### B.      Breach of Contract (Count I)

First up on the merits is Strum's claim for breach of contract.  To state such a claim, Strum must allege "(1) a valid contract between the parties; (2) an obligation or duty arising out of the contract; (3) a breach of that duty; and (4) damages caused by the breach." *CorpCar Servs. Hous., Ltd. v. Carey Licensing, Inc.*, 325 A.3d 1235, 1245 (D.C. 2024) (citation omitted).  The "question of contract formation" is "objective" and requires "both agreement as to all material terms and intention of the parties to be bound." *Feld v. Fireman's Fund Ins. Co.*, 263 F. Supp. 3d 74, 78 (D.D.C. 2017) (cleaned up and citation omitted).  Although "the terms of a signed written agreement" offer the "most clear[] evidence[]" of a "meeting of the minds," a "signed writing is not essential to the formation of a contract." *Davis v. Winfield*, 664 A.2d 836, 838 (D.C. 1995).  All that is required is "a bargain in which there is a manifestation of mutual assent to the exchange and a consideration." *Ascom Hasler Mailing Sys., Inc. v. USPS*, 885 F. Supp. 2d 156, 182 (D.D.C. 2012).

Defendants do not argue that Strum fails to state a claim for breach of contract against Mardam-Bey.  Instead, they contend that Strum does not allege that he entered into a valid contract with Merchant Edge, that Merchant Edge assumed an obligation or duty, or that Merchant Edge breached any duty. *See* ECF No. 20 at 11.  It was Mardam-Bey, after all, who urged Strum to invest and received the $50,000 into his personal account. *Id.*  So Defendants say that Merchant

Edge is off the hook for this claim.

But Strum's allegations about the formation of the contract and its breach go beyond Mardam-Bey. He says that "Defendants Mardam-Bey *and Merchant-Edge* agreed to accept $50,000 from Strum for the purpose of investing in AUSF through an entity to be set up by defendants." Am. Compl. ¶ 50 (emphasis added). True, Strum does not explain whether the parties put that agreement in writing. But that is "not essential," *Davis*, 664 A.2d at 838, and the conduct allegations—specifically, Strum paying $50,000 and Mardam-Bey returning $30,000 "through" Merchant Edge—support the existence of an agreement between these three parties that Strum would pay money for investment in AUSF, *see* Am. Compl. ¶¶ 31, 53. Further, Strum plausibly alleges that consideration supports this agreement; the parties "exchange[d] . . . promises" when Strum agreed to pay $50,000 so that Defendants would agree to invest that money in AUSF through the LP1 entity. *Wash. Inv. Partners of Del., LLC v. Sec. House, K.S.C.C.*, 28 A.3d 566, 574 (D.C. 2011) (courts "will not inquire into the adequacy of consideration, even where it is arguably slight, as long as it is legally sufficient" (internal quotation marks and citation omitted)). Put differently, Defendants received capital they would not have otherwise had, and Strum received access to an otherwise-unavailable investment opportunity. In sum, Defendants offer no reason why Strum has not plausibly alleged a valid contact with Merchant Edge.

The remaining elements are straightforward. As explained, Strum alleges that "Defendants" (including Merchant Edge) had a duty under the agreement to "invest[]" the $50,000 "in AUSF through an entity"—*i.e.*, LP1. Am. Compl. ¶ 50. But that allegedly never happened because Mardam-Bey and "Merchant Edge used such funds for," among other things, "business opportunities" and "Merchant Edge's ongoing operations." *Id.* ¶¶ 33, 51–52; *see also id.* ¶ 57 (alleging that "defendants" used the funds to "pay[] business expenses"). Those allegations cover the

duty and breach elements for Merchant Edge. And the last element—damages—follows naturally. Because of "defendants' failure" to invest the funds or return the money, Strum says he has incurred "severe economic damage," "lost additional income," and "suffered severe emotional distress." *Id.* ¶¶ 35, 54–55. No more is required at the pleading stage.

Defendants raise a limited challenge to the breach-of-contract claim against Mardam-Bey. In truth, this argument is not about whether Strum states a claim for relief. Rather, Defendants contend that *extent* of relief for this claim is capped at $20,000 because Strum alleges that Defendants have already returned $30,000. But this is not a task for the Court at the motion-to-dismiss stage. After all, "the amount of damages Defendants owe is a fact question." *Elkins v. District of Columbia*, 250 F.R.D. 20, 22 (D.D.C. 2008). And "[r]ecoverable damages in a breach of contract action include those arising directly from the breach itself" as well as those that "could reasonably have been in contemplation of both parties when they made the contract." *U.S. Conf. of Mayors v. Great-W. Life & Annuity Ins. Co.*, 327 F. Supp. 3d 125, 131 (D.D.C. 2018) (citation omitted). That zone of potential recovery, moreover, "generally" covers "[a]ctual lost profits" so long as they are not "based on a speculative estimate." *Id.* Here, Strum alleges that Defendants agreed to but did not *invest* $50,000 into a cryptocurrency fund. So if he can show down the road that his return would have exceeded his original investment had Defendants followed through on that promise, his breach-of-contract claim might permit damages beyond the unreturned $20,000. Defendants do not contest that Strum has stated a breach-of-contract claim against Mardam-Bey, and the Court has no basis to prematurely limit his potential recovery at this point.

For these reasons, the Court will deny Defendants' motion to dismiss as to Count I.

## C.    Unjust Enrichment (Count II)

Next, consider Strum's claim for unjust enrichment. A plaintiff states this claim under D.C. law "when (1) the plaintiff confers a benefit on the defendant; (2) the defendant retains the

benefit; and (3) under the circumstances, the defendant's retention of the benefit is unjust." *Armenian Assembly of Am., Inc. v. Cafesjian*, 597 F. Supp. 2d 128, 134 (D.D.C. 2009). Typically, an unjust-enrichment claim is "barred where a contract controls the respective rights of the parties" because "courts will not displace the terms of a contract and impose some other duties not chosen by the parties." *Glasgow v. Camanne Mgmt., Inc.*, 261 A.3d 208, 215 (D.C. 2021) (cleaned up and citation omitted). But while a plaintiff "ultimately cannot recover under both a breach of contract claim and an unjust enrichment claim pertaining to the subject matter of th[e] contract," he "may pursue" the latter as an "alternative theory of liability." *Smith v. Rubicon Advisors, LLC*, 254 F. Supp. 3d 245, 250 (D.D.C. 2017) (citation omitted). A different rule could leave a plaintiff with no "remedy should the fact-finder determine at a later stage that there was no express agreement." *Id.* at 250–51 (declining to dismiss "unjust enrichment claims at the motion to dismiss stage").

Defendants raise familiar arguments in pressing for dismissal of this claim: no claim against Merchant Edge, and a claim of $20,000 at most against Mardam-Bey. *See* ECF No. 20 at 12–13. Merchant Edge cannot be liable, they say, because Strum alleges that he sent the money directly to Mardam-Bey. In their view, that transactional detail means that Strum fails to allege that he conferred a benefit on Merchant Edge. But the first element is not so rigid. Rather, "a benefit indirectly conferred on a defendant can support an unjust enrichment claim." *Campbell v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*, 130 F. Supp. 3d 236, 256–57 (D.D.C. 2015) (collecting cases). And that is precisely what Strum alleges: he "provided [the] funds to *defendants* with the understanding" that the money "would be invested in AUSF," and both Mardam-Bey *and* "Merchant Edge[] derived substantial benefit from tho[se] monies." Am. Compl. ¶¶ 56, 59 (emphasis added). The funds' "layover in the account[]" of Mardam-Bey does not undermine the

allegation that Strum conferred a benefit—$50,000—"that wound up with" Merchant Edge too.

*Kim v. DP Capital LLC*, No. 23-cv-1101 (TJK), 2024 WL 4253168, at *8 (D.D.C. Sept. 20, 2024);

*see also, e.g.*, *Glasgow*, 261 A.3d at 221 (explaining that "the theory of unjust enrichment" may

"apply to indirect payments"). Defendants do not challenge the remaining elements, likely because

Strum alleges that Mardam-Bey and Merchant Edge have "refused to fully return the sums due"

but have instead used those funds for their own purposes. *E.g.*, Am. Compl. ¶¶ 57, 60.

As with the contract claim, Defendants also argue that the unjust-enrichment claim cannot

exceed $20,000. *See* ECF No. 20 at 13. And once again, Defendants jump the gun. Unjust en-

richment calls for the remedy of "restitution, which is typically measured by reference to the de-

fendant's *gain* rather than the plaintiff's *loss*." *Peart v. D.C. Hous. Auth.*, 972 A.2d 810, 820 (D.C.

2009). So focusing on Strum's allegation that *he* is out $20,000 does not show as much as De-

fendants think. True, Strum's losses might "provide a reasonable approximation of the appropriate

award." *Id.* But making that "calculation" and cabining Strum's recovery would be premature at

the pleading stage. *Id.* Defendants will have their chance later to argue that the recovery for this

claim, as with the contract claim, should be less than what Strum seeks.

For these reasons, the Court will deny Defendants' motion to dismiss as to Count II.[3]

---

[3] In one sentence in the jurisdictional section of their motion, Defendants say that "[a]n unjust-enrichment claim cannot lie if a valid contract exists." ECF No. 20 at 10. The Court declines to develop this argument—which they do not mention in the part of their motion devoted to this claim—for them. *See Johnson v. Pancetta*, 953 F. Supp. 2d 244, 250 (D.D.C. 2013) ("perfunctory and undeveloped arguments" are waived). In any event, because "it is undetermined whether a valid contract will even govern the precise issue" underlying the unjust-enrichment claim, the Court would not dismiss that claim on those grounds "[a]t this early stage" of the litigation. *Montesano v. Cath. Univ. of Am.*, 548 F. Supp. 3d 6, 12 (D.D.C. 2021). Defendants contest the existence of a contract between Merchant Edge and Strum. ECF No. 20 at 11. And although they appear to concede that *some* contract existed between Mardam-Bey and Strum, *see id.* at 12, the "scope of the contract" is unclear, *see Smith v. Rubicon Advisors, LLC*, 254 F. Supp. 3d 245, 250 n.9 (D.D.C. 2017) (declining to dismiss unjust-enrichment claim). That lack of clarity,

### D.       Fraud (Counts III and IV)

To state a fraud claim under District of Columbia law, Strum must adequately allege five "essential elements": "(1) a false representation (2) in reference to material fact, (3) made with knowledge of its falsity, (4) with the intent to deceive, and (5) action is taken in reliance upon the representation." *Atraqchi v. GUMC Unified Billings Servs.*, 788 A.2d 559, 563 (D.C. 2002) (citation omitted).  The third element—knowledge of falsity—"may be satisfied by showing that the statements were recklessly and positively made without knowledge of (their) truth." *McMullen v. Synchrony Bank*, 164 F. Supp. 3d 77, 95 (D.D.C. 2016) (citation omitted).  Further, "[i]n cases involving commercial contracts negotiated at arm's length," the "defrauded party's reliance" must have been "*reasonable*." *Williams v. District of Columbia*, 902 A.2d 91, 94 (D.C. 2006) (citation omitted).  On top of that, Federal Rule of Civil Procedure 9(b) requires plaintiffs alleging fraud to "plead with particularity" the "time . . . of the false representations, who precisely was involved in the fraudulent activity, the fact misrepresented, and facts that exemplify the purportedly fraudulent scheme." *McMullen*, 164 F. Supp. 3d at 95 (internal quotation marks and citation omitted).  That particularity requirement, however, does not apply to allegations about the "conditions of a person's mind" such as "malice, intent, [or] knowledge." *Id.* (cleaned up and citation omitted).  A plaintiff may allege those facts "generally." *Id.* (citation omitted).

Strum's allegations about Mardam-Bey fit hand in glove with the essential elements of fraud.  First, the false representation: Strum says that Mardam-Bey told him that an investment "structure had been approved" that would allow Strum to invest in AUSF through LP1, an entity that he and Merchant Edge had "set up" to "invest [in] AUSF" the funds "placed in LP1."  Am.

---

combined with Defendants' failure to press this argument, is reason to not dismiss the unjust-enrichment claim at the pleading stage.

Compl. ¶¶ 29–30.  But that statement was allegedly false; Mardam-Bey "never made any effort to invest such funds in AUSF" and "never set up LP1 or any entity" that could have enabled the promised investment.  *Id.* ¶¶ 33–34.  Second, that representation concerned a material fact—*i.e.*, one that "is 'of importance to a reasonable person in making a decision about a particular matter or transaction.'"  *de Lupis v. Bonino*, No. 07-cv-1372 (RBW), 2010 WL 1328813, at *4 (D.D.C. Mar. 31, 2010) (quoting *United States v. Philip Morris USA Inc.*, 566 F.3d 1095, 1122 (D.C. Cir. 1996)).  Strum alleges that he would not have transferred the $50,000 but for the misrepresentation.  *See* Am. Compl. ¶¶ 68, 79.  That makes ample sense: what person would not find the approval— or lack thereof—of an investment structure important when that structure is the mechanism by which the counterparty proposes to invest the person's $50,000?  Third, Strum claims that Mardam-Bey "knew that representation to be false," *id.* ¶ 66, and the alleged facts also support that knowledge.  Mardam-Bey himself proposed the investment mechanism but allegedly never set up the LP1 entity, so it is hard to see how he could not have known that the transaction structure was unavailable to invest the funds as promised.  Fourth, the allegations also suggest that Mardam-Bey "misle[d]" Strum by inducing him to transfer $50,000 based on the belief that the money "would be placed in AUSF through" the purportedly approved LP1 entity.  *Id.* ¶¶ 64, 67–69.  And fifth, for the same reasons that the misrepresentation was material, Strum alleges that he relied to his detriment on Mardam-Bey's false statements and sent the $50,000 because of them.  *See id.* ¶¶ 68– 70.

The amended complaint also satisfies Rule 9(b)'s particularity requirement as to Mardam-Bey.  Contending otherwise, Defendants point out that Strum "relies on the musty and common refrain 'upon information and belief.'"  ECF No. 20 at 16.  But including that "refrain" in some places does not somehow eliminate the specific allegations about the circumstances of the fraud.

Indeed, Strum describes the nature of the false representation about the approved investment structure (LP1 would be the conduit for investing his $50,000 in AUSF), *see* Am. Compl. ¶¶ 27–30; who made that representation (Mardam-Bey), *see id.* ¶¶ 27, 29–30; the timing of the fraud (May 2022, as well as in the months following the initial rejection of Strum's funds), *see id.* ¶¶ 25, 30; and the location of Mardam-Bey's solicitation efforts as part of this scheme (Washington, D.C.), *see id.* ¶¶ 9, 16, 31. True, Strum's amended complaint would be on stronger footing with "specific dates," *U.S. ex rel. Scott v. Pac. Architects & Eng'rs (PAE), Inc.*, 270 F. Supp. 3d 146, 154 (D.D.C. 2017) (citation omitted), and additional details about the May 2022 communications in which Mardam-Bey "kept re-iterating that . . . the LP[1] structure had been approved" for Strum's AUSF investment, Am. Compl. ¶ 30. But "Rule 9(b) does not require as much," and Mardam-Bey "has been provided sufficient information in order to mount a defense" against this fraud claim even without "every detail" about the alleged fraud. *Pac. Architects & Eng'rs*, 270 F. Supp. 3d at 154 (citation omitted); *see also Rothschild Broad., LLC v. Law Offices of Evan D. Carb, PLLC*, No. 20-cv-2794 (RC), 2021 WL 4243411, at *9 (D.D.C. Sept. 17, 2021) (denying motion to dismiss on Rule 9(b) grounds where allegations sufficiently "put Defendants on notice of th[e] allegedly fraudulent course of conduct" despite not "provid[ing] granular information regarding the time, location, or content of specific misrepresentations").

Defendants raise two other challenges to Strum's fraud claim, but neither warrants dismissal of that claim against Mardam-Bey. They assert that Strum does not allege that Mardam-Bey's representation about the investment structure—that it had been approved and would be used to invest in AUSF—was false, that Mardam-Bey knew it was false, or that Mardam-Bey intended to deceive Strum. ECF No. 20 at 14–15. The allegations beg to differ. Strum says that Mardam-Bey told him that he had "set up" the approved LP1 entity to invest Strum's funds into AUSF.

Am. Compl. ¶ 30.  Mardam-Bey, however, "never set up LP1 or any entity . . . to invest in AUSF," so that representation was false.  *Id.* ¶ 33.  And as explained, not only does Strum allege that Mardam-Bey knew that this statement was false and intended to deceive him, *see id.* ¶¶ 65–69, but other factual allegations support those inferences too.  Mardam-Bey "frequently told" Strum that he should invest through the non-existent investment "structure" that he claimed to have established, *id.* ¶ 30, and Defendants fail to explain how Mardam-Bey would not have known that the investment mechanism *he said he would create* did not exist.

Next, Defendants contend that Strum's fraud claim fails because his reliance on Mardam-Bey's statements was "objectively unreasonable."  ECF No. 20 at 16.  That is so, Defendants say, because Strum has previously sued Mardam-Bey for fraudulently inducing him to make loans that Mardam-Bey never paid back.  *See id.* at 17–18.  Strum thus should have learned his lesson and not have relied on Mardam-Bey's statements about the AUSF investment opportunity.  *See id.* at 18–19.  But "the reasonableness of the reliance can be an issue of fact that should be left for a jury," and here the Court cannot say that "no reasonable person would have relied on" Mardam-Bey's "representation[s]" about AUSF.  *Burman v. Phoenix Worldwide Indus., Inc.*, 384 F. Supp. 2d 316, 329 (D.D.C. 2005).  Perhaps Strum should have been less trusting of Mardam-Bey given their history.  He alleges, though, that Mardam-Bey presented this opportunity as a way to settle the previous debts.  *See* Am. Compl. ¶¶ 23–24.  And the investment structure that Mardam-Bey allegedly proposed seemed to be a solution for the issues that had interfered with Strum's first attempt to invest.  *See id.* ¶¶ 25–28.

These are just some of the factual issues that need development to assess the reasonableness of Strum's reliance.  Again, none of this is to say that Strum would not have benefitted from more skepticism.  It is to say, however, that the Court cannot conclude, based *only* on the allegations in

the amended complaint, that "*no* reasonable person would have relied" on Mardam-Bey's state-ments about a purportedly approved investment structure for a cryptocurrency fund that Mardam-Bey had marketed to Strum and others throughout the United States. *Davis v. World Sav. Bank, FSB*, 806 F. Supp. 2d 159, 173 (D.D.C. 2011) (emphasis added); *see also* Am. Compl. ¶ 16.

Although Strum has stated a fraud claim against Mardam-Bey, Merchant Edge is a slightly different story. To allege fraud, "a plaintiff must show that the defendant, with the intent to deceive the plaintiff, knowingly made a false representation of material fact." *Pyles v. HSBC Bank USA, N.A.*, 172 A.3d 903, 907 (D.C. 2017). But rather than suggest that Merchant Edge "affirmatively made any false representations to" Strum, the allegations focus on what *Mardam-Bey* told Strum about the investment opportunity. *Jericho Baptist Church Ministries, Inc. (D.C.) v. Jericho Baptist Church Ministries, Inc. (Md.)*, No. 16-cv-647 (APM), 2020 WL 1703937, at *6 (D.D.C. Apr. 8, 2020) (granting motion to dismiss fraud claim as to certain defendants). And Strum's opposition makes clear who made the allegedly false statements: "Mardam-Bey stated that he was going to place Strum's funds" in an entity "for the purpose of investing in AUSF," and "[t]hat representa-tion was false and known to be false by Mardam-Bey." ECF No. 22 at 27; *see also, e.g., id.* at 28 ("Mardam-Bey represented to Strum that the [LP1 entity] had been approved . . . ."); *id.* ("That was a false representation made by Mardam-Bey . . . ."). The direct fraud claim against Merchant Edge, then, falters on this ground.

Strum also tries to pin the fraud on Merchant Edge through a conspiracy count. *See* Am. Compl. ¶¶ 63–70. As he concedes, "[c]ivil conspiracy is not an independent tort but only a means for establishing vicarious liability for an underlying tort." *Grimes v. D.C., Bus. Decisions Info. Inc.*, 89 A.3d 107, 115 (D.C. 2014); ECF No. 22 at 30. Doing so requires "(1) an agreement between two or more persons (2) to participate in an unlawful act, and (3) an injury caused by an

unlawful overt act performed by one of the parties to the agreement pursuant to, and in furtherance of, the common scheme." *Paul v. Howard Univ.*, 754 A.2d 297, 310 (D.C. 2000). Defendants, for their part, do not argue that Strum has failed to plead a conspiracy. Instead, they say only that he has not stated a claim for the "underlying tort" of fraud and that the "conspiracy theory" of liability thus "fails as a matter of law." ECF No. 20 at 20. But as explained, the Court finds that Strum *has* stated a claim for fraud against Mardam-Bey. So although Strum may not recover for a conspiracy claim as an independent tort, he may pursue a fraud claim against Merchant Edge on a theory of conspiracy liability.

For these reasons, the Court will deny Defendants' motion as to Count III. As to Count IV, the Court will grant Defendants' motion to the extent Strum alleges conspiracy liability as an independent tort, but it will deny the motion to the extent he alleges vicarious liability through a conspiracy theory.

### E.    Intentional Infliction of Emotional Distress (Count V)

Strum also brings a claim for intentional infliction of emotional distress based on Defendants' refusal to return the $50,000 after not investing it in AUSF as promised. *See* Am. Compl. ¶¶ 72–75. To establish such a claim, he must plausibly allege "(1) extreme and outrageous conduct on the part of the defendants" that "(2) intentionally or recklessly (3) causes [him] severe emotional distress." *Competitive Enter. Inst. v. Mann*, 150 A.3d 1213, 1260 (D.C. 2016). The first element is demanding; the alleged conduct must be "so outrageous in character, and so extreme in degree, as to go beyond decency." *Id.* (citation omitted). Phrased differently, conduct clears this hurdle only if it is "regarded as atrocious" and "utterly intolerable in a civilized society." *Id.* (citation omitted).

Strum's allegations fall far short of that standard. He says that Mardam-Bey failed "to repay monies due and owing" despite knowing about Strum's deteriorating health. Am. Compl.

¶ 72.  As an initial matter, then, Strum seems to focus this claim on Mardam-Bey's conduct rather than that of Merchant Edge.  But even charitably interpreted as alleging extreme conduct in the form of Defendants' failure to invest or return the $50,000, the amended complaint offers only the kind of misconduct in "the commercial arena" that "does not rise to the level of outrageous behavior required to support a claim for intentional infliction of emotional distress."  *Cuneo L. Grp., P.C. v. Joseph*, 669 F. Supp. 2d 99, 122 (D.D.C. 2009) (citation omitted).  Claiming that Defendants "denied the payment of money owed" is not enough.  *Id.*  And in the business world, "it is commonplace that . . . other parties engage in misrepresentation" and "renege on promises."  *Williams v. Fed. Nat'l Mortgage Ass'n*, No. 05-cv-1483 (JDB), 2006 WL 1774252, at *10 (D.D.C. June 26, 2006).  As this case shows, "such conduct may support other causes of action."  *Id.*  But it is not "outrageous behavior" for purposes of a claim for intentional infliction of emotional distress.  *Id.*

For these reasons, the Court will grant Defendants' motion to dismiss as to Count V.

## F.    Conversion (Count VI)

Finally, Strum's last claim is for conversion.  That claim has four elements under D.C. law: "(1) an unlawful exercise, (2) of ownership, dominion, or control, (3) of the personal property of another, (4) in denial or repudiation of that person's rights thereto."  *Busby v. Cap. One, N.A.*, 772 F. Supp. 2d 268, 280 (D.D.C. 2011) (citation omitted).  Money, though not the paradigm property, "can be the subject of a conversion claim"—but "only if the plaintiff has the right to a specific identifiable fund of money."  *de Lupis*, 2010 WL 1328813, at *7 (quoting *Curaflex Health Servs., Inc. v. Bruni*, 877 F. Supp. 30, 32 (D.D.C. 1995)).  And a plaintiff cannot prevail on a conversion claim that seeks only "to enforce a contractual obligation for payment of money."  *Cuneo L. Grp.*, 669 F. Supp. 2d at 123.

Defendants' arguments for dismissal follow the pattern of their challenges to the unjust-

enrichment and breach-of-contract claims.  First, they contend that Strum fails to "allege that Merchant-Edge received the $50,000," so the conversion claim cannot survive as to that defendant.  ECF No. 20 at 14.  Developing this argument no further, Defendants presumably mean that because Strum allegedly sent the money to Mardam-Bey's personal account, Merchant Edge never exercised "ownership, dominion, or control" over Strum's property.  *Busby*, 772 F. Supp. 2d at 280.  But Strum alleges the opposite.  He says, for example, that the money went "to *defendants* through the personal account of Mardam-Bey"—in other words, that *both* Defendants controlled the money after the transfer to Mardam-Bey's account.  Am. Compl. ¶ 77 (emphasis added).  More than that, Strum alleges that Defendants used the funds for "Merchant Edge's ongoing operations," which would be hard to do if Merchant Edge never exercised control over the money.  *Id.* ¶ 33.  And finally, Strum claims that Defendants have returned some of the $50,000 "through a Merchant Edge account"—again, an act that requires (or at least suggests) that Merchant Edge had some control over the money.  *Id.* ¶ 53.  Taking the allegations as true and drawing the inferences in Strum's favor, the Court finds that Strum plausibly alleges that Merchant Edge exercised control over his property.  The allegations also support the inference that Merchant Edge's exercise of ownership was unlawful and in denial of Strum's rights.  Strum claims that he transferred the $50,000 so that Defendants could do one specific thing with the money: "invest[]" it "in AUSF."  *Id.* ¶ 31; *see also, e.g.*, *id.* ¶ 50 ("Defendants . . . agreed to accept $50,000 from Strum for the purpose of investing in AUSF . . . .").  Rather than exercise control over the money in that limited and approved way, Defendants used it for their own purposes and did not return it to Strum when requested.  *See id.* ¶¶ 78–79.

Second, Defendants argue that Strum, who alleges that Defendants have returned $30,000, has not stated "a $50,000 conversion claim against Mardam-Bey."  ECF No. 20 at 14.  Although

the Court will again decline to make conclusive damages determinations at the motion-to-dismiss stage, Strum's allegations that Defendants returned $30,000 may be relevant to his recovery if he ultimately prevails on this claim. The "usual" measure of damages for this claim is "the fair market value of the property in question at the time of the conversion." *Tr. of Univ. of D.C. v. Vossoughi*, 963 A.2d 1162, 1175 (D.C. 2009). But "[t]he amount of damages for the conversion of a chattel is diminished by its recovery or acceptance by a person entitled to its possession." *Council on Am.-Islamic Relations Action Network v. Gaubatz*, 82 F. Supp. 3d 344, 352 (D.D.C. 2015) (quoting Restatement (Second) of Torts § 922). Perhaps Strum can show that he suffered "damages for the period during which [he was] deprived" of the funds. *Id.* Or he might show that "pre-judgment interest" as "part of the damages" for his "conversion" claim is appropriate. *Bucheit v. Palestine Liberation Org.*, 388 F.3d 346, 350 (D.C. Cir. 2004) (citation omitted). That precise calculation, however, is inappropriate at this early stage of the litigation—particularly given the parties' cursory treatment of the issue in their briefing.

In the part of their motion arguing that the Court lacks jurisdiction, Defendants assert without elaboration that "a claim for conversion of money cannot lie when a party is seeking to collect a debt pursuant to a contractual agreement." ECF No. 20 at 10. They say no more about this point—indeed, they do not even reiterate it—when contending that Strum failed to state a conversion claim. *See id.* at 13–14. The Court's role is not to "research and construct legal arguments open to parties, especially when they are represented by counsel," so this "perfunctory and undeveloped argument[]" is "waived." *Johnson v. Pancetta*, 953 F. Supp. 2d 244, 250 (D.D.C. 2013) (citation omitted).

In any event, the allegations support the inference that Strum is *not* merely seeking to collect a debt under a contract. True, "fungible cash" is not "the type of fund" that may support "a

claim for conversion." *McNamara v. Picken*, 950 F. Supp. 2d 193, 195 (D.D.C. 2013).  But Strum alleges that he "paid" Defendants a specific and identifiable fund of money—the $50,000 in the May 2022 transfer—and that Defendants "never used [it] in a way that would benefit" Strum as contemplated by the agreement underlying the transfer.  *Gov't of Rwanda v. Rwanda Working Grp.*, 227 F. Supp. 2d 45, 63 (D.D.C. 2002) (holding defendant liable for "conversion of both the $28,000" under one agreement "and the $55,000 under" another); *see also Cuneo L. Grp.*, 669 F. Supp. 2d at 124 (describing *Government of Rwanda* as supporting conversion liability where "the defendant had received a specific identifiable sum of money from the plaintiffs, did not perform the services required by the contract, and did not return the money when requested to do so by the plaintiffs").  In other words, he claims that Defendants "misapplied" the $50,000, which should have "go[ne] toward" the investment in AUSF but "instead" was "directed . . . toward" Defendants' personal uses.  *Busby v. Cap. One, N.A.*, 932 F. Supp. 2d 114, 144–45 (D.D.C. 2013) (denying motion to dismiss conversion claim where plaintiff alleged that a bank misapplied mortgage payments by directing them toward escrow charges, which the bank allegedly "lacked authority" to do).  Strum, then, alleges that Defendants misused the specific $50,000 that he gave them and in doing so denied him his rights to that specific fund of money.  *See* Am. Compl. ¶¶ 77–79.  And with no developed explanation for why the conversion claim should be dismissed because it is based on money, the Court declines to construct this argument for Defendants.

For the above reasons, the Court will deny Defendants' motion to dismiss as to Count VI.

### G.    Leave to Amend

In his opposition brief, Strum requests leave to file a second amended complaint.  *See* ECF No. 22 at 13 n.4.  He claims that he has "prepared" a draft of that complaint, *id.*, and offers some hints at changes that he would make.  (For example, some paragraphs would not use the phrase "[u]pon information and belief," and he would add a "Count of Negligent Infliction of Emotional

24

Distress." *Id.* at 13, 16, 24.) Defendants oppose, arguing that "Strum is <u>not</u> entitled to a wait-and-see, advisory opinion from the Court before moving to amend." ECF No. 24 at 15.

The main problem for Strum is that "an opposition brief" is not "the proper place to request leave to amend a complaint." *Lamb v. ATF*, No. 20-cv-3036 (TJK), 2022 WL 203433, at *7 (D.D.C. Jan. 24, 2022). Although Federal Rule of Civil Procedure 15(a) provides that leave to amend "shall be freely given when justice so requires," that rule "applies only when the plaintiff actually has moved for leave to amend the complaint; absent a motion, there is nothing to 'be freely given.'" *Massaquoi v. District of Columbia*, 81 F. Supp. 3d 44, 55 (D.D.C. 2015) (citation omitted). Strum's request also flouts this Court's local rules. He not only failed to file a separate motion with "a statement of the specific points of law and authority that support" it, *see* LCvR 7(a), but he also did not "attach, as an exhibit" to his "motion for leave to file an amended pleading," a "copy of the proposed pleading as amended," *see* LCvR 15.1. And that non-compliance is more than a mere technical error. Instead, the lack of a separate motion and proposed amended pleading "make[s] it impossible for the Court (or the [Defendant]) to evaluate the merits of [Strum's] request for leave to amend." *Johnson v. District of Columbia*, 49 F. Supp. 3d 115, 122 (D.D.C. 2014). Given these deficiencies, the Court will deny Strum's opposition-brief request for leave to amend. *See Rollins v. Wackenhut Servs., Inc.*, 703 F.3d 122, 130–31 (D.C. Cir. 2012) (affirming denial of leave to amend where plaintiff "requested leave to amend as an alternative argument in her opposition to the [defendants'] motions to dismiss").

## IV.    Conclusion

For all these reasons, the Court will grant Defendants' Motion to Dismiss as to Count IV (to the extent Strum alleges conspiracy liability as an independent tort) and Count V. But the Court will deny Defendants' Motion as to Counts I, II, III, IV (to the extent Strum alleges vicarious liability), and VI. A separate order will issue.

/s/ Timothy J. Kelly
TIMOTHY J. KELLY
United States District Judge

Date: February 4, 2025